# 22-2090

*To Be Argued By*:
DANIEL G. NESSIM

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**Docket No. 22-2090**

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

ARIEL JIMENEZ, also known as Sealed Defendant,

*Defendant-Appellant*,

IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, also known as Junior, JOSE CASTILLO, also known as Jairo,

*Defendants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the Southern District of New York, Attorney for the United States of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

DANIEL G. NESSIM,
NI QIAN,
OLGA I. ZVEROVICH,
*Assistant United States Attorneys, Of Counsel.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. The Government's Case . . . . . . . . . . . . . . . . 3

1. Jimenez's Participation in the Tax Fraud Scheme . . . . . . . . . . . . . . . . . . . . 4

2. Jimenez's Use of Proceeds of the Tax Fraud Scheme . . . . . . . . . . . . . . . . . . . . 8

3. Jimenez's Transfers of the Bronx Properties and Money Laundering . . . 10

4. Rule 404(b) Evidence . . . . . . . . . . . . . . 11

B. The Verdict . . . . . . . . . . . . . . . . . . . . . . . . 11

C. Jimenez's Post-Trial Motions . . . . . . . . . . . 12

D. Jimenez's Sentencing . . . . . . . . . . . . . . . . . 13

ARGUMENT:

POINT I—The Evidence Was Sufficient to Support Jimenez's Convictions . . . . . . . . . . . . . . . . . . . . 13

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 14

1. Sufficiency of the Evidence . . . . . . . . . 14

2. Statute of Limitations and Withdrawal from a Conspiracy . . . . . . . . . . . . . . . . 16

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 18

Case 22-2090, Document 41, 04/05/2023, 3495069, Page3 of 43



PAGE

1. There Was Sufficient Evidence to Support Jimenez's Convictions . . . . . . 18

2. The District Court Correctly Denied Jimenez's Post-Trial Motions Challenging His Conspiracy Convictions Based on His Withdrawal Defense . . . 23

POINT II—The District Court Did Not Err in Its Jury Instructions on Withdrawal . . . . . . . . . . . 29

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 29

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 31

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

*Cases*:

*In re Terrorist Bombings of U.S. Embassies in East Africa*,
552 F.3d 93 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . 16

*Jackson v. Virginia*,
443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Neder v. United States*,
527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

*Smith v. United States*,
568 U.S. 106 (2013) . . . . . . . . . . . . . . . . . . . . . . . . 17

PAGE

*United States v. Abelis*,
146 F.3d 73 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . 15

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 31

*United States v. Antar*,
53 F.3d 568 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . 34

*United States v. Applins*,
637 F.3d 59 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . 32

*United States v. Atilla*,
966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . 14, 15

*United States v. Baker*,
899 F.3d 123 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 22

*United States v. Berger*,
224 F.3d 107 (2d Cir. 2000) . . . . . . . . . . . . . *passim*

*United States v. Chow*,
993 F.3d 125 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 15

*United States v. Clare*,
652 F. App'x 32 (2d Cir. 2016) . . . . . . . . . . . . 16, 18

*United States v. Delva*,
282 F. App'x 89 (2d Cir. 2008) . . . . . . . . . . . . . . . 22

*United States v. DeMizio*,
741 F.3d 373 (2d Cir. 2014) . . . . . . . . . . . . . . 32, 35

*United States v. Diaz*,
176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 17

*United States v. Draper*,
553 F.3d 174 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 16

Case 22-2090, Document 41, 04/05/2023, 3495069, Page5 of 43



PAGE

*United States v. Eisen*,
974 F.2d 246 (2d Cir. 1992) . . . . . . . . . . . . . . 32, 33

*United States v. Eppolito*,
543 F.3d 25 (2d Cir. 2008) . . . . . . . . . . . . . . *passim*

*United States v. Feliciano*,
223 F.3d 102 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 31

*United States v. Hamilton*,
538 F.3d 162 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 17

*United States v. Ho*,
984 F.3d 191 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 15

*United States v. Jabar*,
19 F.4th 66 (2d Cir. 2021) . . . . . . . . . . . . . . . 14, 15

*United States v. James*,
712 F.3d 79 (2d Cir. 2013) . . . . . . . . . . . . . . . 16, 28

*United States v. Kozeny*,
667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 14

*United States v. Landesman*,
17 F.4th 298 (2d Cir. 2021) . . . . . . . . . . . . . . 15, 16

*United States v. Leslie*,
658 F.3d 140 (2d Cir. 1997) . . . . . . . . . . . . . *passim*

*United States v. Martinez*,
862 F.3d 223 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 33

*United States v. Milstein*,
401 F.3d 53 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . 16

*United States v. Murray*,
414 F. App’x 318 (2d Cir. 2011) . . . . . . . . . . . 16, 18

PAGE

*United States v. Percoco*,
13 F.4th 158 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 16

*United States v. Persico*,
645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . 15

*United States v. Salmonese*,
352 F.3d 608 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 17

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 22

*United States v. Wilkerson*,
361 F.3d 717 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 31

*Statutes, Rules, & Other Authorities:*

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 286 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1028A. . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3282(a). . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Crim. P. 52(a). . . . . . . . . . . . . . . . . . . . . 32, 35

# United States Court of Appeals
## FOR THE SECOND CIRCUIT
## Docket No. 22-2090

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ARIEL JIMENEZ, also known as Sealed Defendant,

*Defendant-Appellant,*

IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, also known as Junior, JOSE CASTILLO, also known as Jairo,

*Defendants.*

## BRIEF FOR THE UNITED STATES OF AMERICA

### Preliminary Statement

Ariel Jimenez appeals from a judgment of conviction entered on September 13, 2022, in the United States District Court for the Southern District of New York, following a trial before the Honorable Sidney H. Stein, United States District Judge, and a jury.

Superseding Indictment S3 18 Cr. 879 (SHS) (the "Superseding Indictment") was filed on September 9, 2021, in four counts. Count One charged Jimenez with conspiracy to defraud the United States with respect to claims, in violation of 18 U.S.C. § 286. Count Two charged Jimenez with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Three charged Jimenez with aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1)&(b) and 2. Count Four charged Jimenez with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2.[1]

For purposes of the statute of limitations, Counts One through Three of the Superseding Indictment related back to Indictment 18 Cr. 879 (SHS) (the "Original Indictment"), which was filed on December 12, 2018, and which charged Jimenez with the same offenses contained in Counts One through Three of the Superseding Indictment.

Trial commenced on February 9, 2022, and ended on February 22, 2022, when the jury returned a verdict of guilty on all four counts of the Superseding Indictment.

On September 12, 2022, Judge Stein sentenced Jimenez principally to a term of 144 months' imprisonment, to be followed by three years' supervised release.

Jimenez is serving his sentence.

---

[1] An amended version of the Superseding Indictment was filed on February 15, 2022, correcting a clerical error in Count Three.

## Statement of Facts

### A. The Government's Case

The Government's proof at trial established that, between 2009 and 2015, Jimenez owned and operated a Bronx-based tax preparation business (the "Jimenez Tax Business" or the "Business") through which Jimenez and his employees perpetrated a large-scale identity theft and tax fraud scheme (the "Tax Fraud Scheme"). As part of the Tax Fraud Scheme, Jimenez and his co-conspirators purchased lists of stolen identities of children and sold the stolen identities to their clients to enable the clients to claim false dependents on their tax returns, which the Jimenez Tax Business prepared and filed with the Internal Revenue Service ("IRS"). Through the Tax Fraud Scheme, Jimenez received millions of dollars in fees, which Jimenez used, among other things, to purchase four real estate properties in the Bronx. Jimenez later laundered proceeds of the scheme through transfers of the properties to his parents and to limited liability companies.

The Government's evidence at trial included the testimony of two cooperating witnesses who participated in the Tax Fraud Scheme with Jimenez and others: Ireline Nunez, Jimenez's ex-wife who worked as a manager at the Jimenez Tax Business between 2008 and 2015, and Elvy Jimenez, an employee who worked at the Jimenez Tax Business for much of the period between 2009 and October 2013. The Government's evidence also included, among other things, the testimony of three victims of identity theft whose identities, or whose family members' identities, were stolen

and used in the Tax Fraud Scheme; the testimony of three former clients of the Jimenez Tax Business for whom Jimenez and his employees prepared fraudulent tax returns claiming false dependents; and the testimony of law enforcement witnesses, including an IRS revenue agent who summarized financial and tax records and presented tax loss calculations. The Government also introduced, among other things, fraudulent tax returns filed by Jimenez and his employees; lists of stolen identities used by Jimenez and his employees as part of the Tax Fraud Scheme; property and financial records showing how Jimenez spent and laundered proceeds of the Tax Fraud Scheme; and inculpatory letters that Jimenez wrote to Nunez in approximately 2017 and 2018.

### 1. Jimenez's Participation in the Tax Fraud Scheme

Between 2009 and 2015, Jimenez was the owner and primary decisionmaker at the Jimenez Tax Business, which operated under various names, including Melosky (after Jimenez's nickname, "Melo") and JIMFA Help and Resolution Center ("JIMFA," for "Jimenez family"). (SA 75, 81-82, 107, 167-68, 174-75, 177, 189-90).[2] Jimenez worked at the Jimenez Tax

[2] "Br." refers to Jimenez's brief on appeal; "A." refers to the appendix filed with Jimenez's brief; "SPA" refers to the special appendix filed with Jimenez's brief; "SA" refers to the supplemental appendix filed with this brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise

Business with Nunez, his sisters Evelin and Ana Jimenez, and other employees, including Elvy Jimenez.[3] (SA 80-85).

While operating the Jimenez Tax Business, Jimenez purchased stolen identities of children—including names, social security numbers, and dates of birth—from various sources, including an individual named Leonel Severino. (SA 85, 98-99, 169, 178-79, 199-201, 257-58). After obtaining the stolen identities of children—referred to as "pollitos" at the Jimenez Tax Business (SA 77-78, 196-97)—Jimenez and his employees sold them to clients of the Jimenez Tax Business for a fee of between $1,000 and $1,500, in order to enable the clients to falsely claim the children as dependents on the clients' tax returns. (SA 57-74, 130-54, 168-71, 259-64). To keep track of the sales, Jimenez created lists of clients and the number of false dependents they had purchased. (SA 55, 214-15). As a result of the false dependents, the clients received valuable tax benefits, including the Earned Income Tax Credit ("EITC"), which allowed the clients to collect refunds to which they were not entitled. (SA 169-70).

During their meetings with clients, Jimenez and other tax preparers at the Jimenez Tax Business provided the clients with estimates of the clients' inflated tax refunds based on the inclusion of false dependents.

---

noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

[3] Elvy Jimenez has no familial relationship with Jimenez. (SA 75-76).

(SA 60, 138-39, 197). After the client meetings, employees of the Jimenez Tax Business, including Elvy Jimenez, used the lists of stolen identities to add false dependents to the clients' tax returns. (SA 76, 87-95). The Jimenez Tax Business electronically filed the fraudulent tax returns with the IRS. (SA 173). At the direction of Jimenez and Evelin Jimenez, before providing copies of the tax returns to clients, Jimenez Tax Business employees altered the identifying information for the false dependents to prevent the clients from independently reusing the stolen identities. (SA 197-98).

The Jimenez Tax Business was prolific. During peak tax season, as many as 100 or more clients visited the Jimenez Tax Business on a daily basis. (SA 86, 253). Jimenez was one of the most popular tax preparers at the Jimenez Tax Business, meeting with clients in his basement office. (SA 92, 106-07).

In 2012 and 2013, Jimenez prepared false 2011 and 2012 tax returns for a client named Brigido Abreu. (SA 130-50). After a brief meeting, Jimenez provided Abreu with a note that indicated Abreu's estimated tax refund for 2011. (A. 217; SA 138-39, 155-58). The 2011 tax return that Jimenez prepared for Abreu falsely stated that Abreu worked as a mechanic, supported a particular minor child as a dependent, and incurred education expenses for both Abreu and the dependent. (SA 139-43). In 2013, Jimenez similarly prepared Abreu's 2012 tax return with a false dependent. (SA 146-48). Another employee at the Jimenez Tax Business prepared Abreu's 2013 return, which also included a false dependent. (SA 150-51).

Of the approximately 24,299 personal income tax returns that the Jimenez Tax Business prepared and filed for clients for the tax years 2009 through 2014, approximately 14,199, or about 58%, claimed the EITC —a percentage significantly higher than the percentage of taxpayers nationwide and in the Bronx who claimed the EITC during the same period. (SA 47-48). In total, for the tax years 2009 through 2014, the Jimenez Tax Business filed tax returns seeking nearly $38 million in EITC claims alone. (SA 47). In addition to fraudulent EITC claims, the Jimenez Tax Business's use of false dependents resulted in other fraudulent tax benefits to its clients, such as dependent exemptions and child tax credits. (GX 1002-A through 1002-F; SA 265-66, 267-68). As a result of the Tax Fraud Scheme, the Jimenez Tax Business received hundreds of letters to clients from state and federal tax authorities concerning false information contained in the clients' tax returns. (SA 181-82, 191-95).

In January 2015, law enforcement conducted a search of the Jimenez Tax Business's main office in the Bronx. (SA 127-29). Following the search, Jimenez decided to operate the Jimenez Tax Business from a nearby location under the name "Graph" and to file its clients' tax returns using an Electronic Filing Identification Number that had been obtained for a separate tax preparation business opened by Ana Jimenez's husband. (SA 226-30). Once the Jimenez Tax Business was thus set up to continue operations, Jimenez traveled to the Dominican Republic. (SA 231-32). Jimenez continued to file tax returns for the Jimenez Tax Business from the Dominican Republic, where he remained

for approximately five to six months in 2015. (SA 231-33).

### 2. Jimenez's Use of Proceeds of the Tax Fraud Scheme

The Jimenez Tax Business profited from the Tax Fraud Scheme in two ways. First, the Jimenez Tax Business charged each client a tax preparation fee that ranged from about $65 to hundreds of dollars. (SA 101, 203). The Business typically charged clients who used false dependents higher tax preparation fees, usually between $450 and $700. (SA 185-86, 203). The tax preparation fees were typically automatically deducted from the clients' tax refunds and deposited directly into the Business's corporate bank accounts. (SA 184-85, 221). Between 2009 and 2014, the corporate bank accounts—to which Jimenez, Evelin Jimenez, and Nunez had access (SA 222)—received millions of dollars in deposits, consisting principally of direct deposits of tax preparation fees and cash deposits. (SA 269-86; GX 1025).[4]

Second, the Jimenez Tax Business charged each client a false dependent fee of between $1,000 and $1,500 per false dependent. (SA 87, 102, 171, 201-02). The false dependent fees were nearly always paid in cash drawn from clients' refund checks, which the IRS

---

[4] Jimenez directed that certain cash deposits into the Business's corporate bank accounts be "structured," that is, that cash be deposited in increments of $10,000 or less to avoid causing the banks to file currency transaction reports. (SA 236-37, 288-89).

mailed directly to the Jimenez Tax Business. (SA 102-03, 186). After receiving the refund checks, Jimenez Tax Business employees accompanied the clients to cash the checks at a check cashing facility to ensure that the false dependent fees were collected. (SA 103-04, 187-88). Evelin Jimenez received the cash from the false dependent fees and brought it to her and Jimenez's mother's house, where, at the end of each tax season, Jimenez, Evelin and Ana Jimenez, and Nunez counted the cash and divided the profits. (SA 26, 171-72, 204-07).[5] Of each false dependent fee charged, Jimenez personally received $1,000. (SA 104-05, 202, 205-08, 254-55).

Jimenez used proceeds of the Tax Fraud Scheme in various ways, including to gamble, pay for vacations, buy luxury goods, and purchase real estate in New York and in the Dominican Republic. (SA 234-39, 271-73). In particular, between 2010 and 2014, Jimenez spent more than $3 million to purchase four properties in the Bronx: a multi-bedroom family home (the "Henry Hudson Property"), a multi-story apartment building (the "University Property"), a commercial lot (the "Bailey Property"), and a multi-unit residential property (the "Davidson Property," collectively, the "Bronx Properties"). (SA 159-66, 223-24, 237-39, 243-46; GX 1030, 1031, 1035, 1036).

---

[5] Government exhibits in the GX 700 series are letters that Jimenez wrote to Nunez in Spanish. Exhibits labeled "-T" are English translations of the corresponding exhibits. For example, GX 704-T (SA 19-22) is an English translation of GX 704 (SA 23-26).

### 3. Jimenez's Transfers of the Bronx Properties and Money Laundering

In January 2013—after the Jimenez Tax Business was fined by state authorities for misuse of certain expenses on clients' tax returns and received numerous complaints from clients regarding the Business's sale of false dependents—Jimenez transferred the Henry Hudson Property to his father to "protect" it. (SA 216-20, 239-41; GX 831, 1204 at 7). Notwithstanding the transfer, Jimenez and Nunez continued to live in the Henry Hudson Property. (SA 240).

In March 2016, Jimenez transferred the remaining three Bronx Properties to his parents for the nominal consideration of $10 per property. (SA 247; GX 1201 at 10, GX 1202 at 4, GX 1203 at 10). Jimenez told Nunez that he decided to transfer the properties because "he wanted to protect the building[s] after the government came to the office," referring to law enforcement's search of the Jimenez Tax Business in January 2015. (SA 248). Despite the transfers, Nunez continued to collect rent from the properties, and Jimenez continued to exercise decision-making authority over the properties. (SA 248-52).

Later in 2016 and in 2018, ownership of all four Bronx Properties was transferred—again, for the nominal consideration of $10 per property—to three different limited liability companies. (SA 241-42; GX 1201 at 4, GX 1202 at 10, GX 1203 at 4). Despite these transfers, Jimenez continued to benefit from, and exercise control over, the Bronx Properties, sending letters to Nunez in 2017 and 2018 with, among other things, instructions about actions to take with respect

to the properties, such as how to increase rental income and which mortgage payments to make. (SA 1-42, 242; A. 236-37).

### 4. Rule 404(b) Evidence

During the period of the Tax Fraud Scheme, Jimenez substantially underreported his income on his personal tax returns. For example, while Jimenez spent $451,000 toward the purchase of the University Avenue Property in 2014, Jimenez's 2014 tax return claimed a total income of $18,000. (SA 256, 290-91; GX 208, 1035, 1036). In addition, on his 2012 tax return, Jimenez claimed falsely claimed as a dependent his niece, who did not live with him. (SA 225). This evidence was introduced at trial pursuant to Federal Rule of Evidence 404(b) to show Jimenez's intent, knowledge, and absence of mistake with respect to the charged offenses. (SA 301).

## B. The Verdict

At the conclusion of the Government's case-in-chief, the defense moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that "[t]he government, even taking all of the inferences in favor of the government, . . . failed to meet [its] burden of proof, in particular, on the aggravated identity theft charge, . . . which has a five-year statute of limitations." (SA 292). Judge Stein denied the Rule 29 motion subject to renewal after the jury's verdict. (SA 293).

The defense did not call any witnesses. In its closing argument, the defense argued, among other things,

that Jimenez had withdrawn from the charged conspiracies before the statute-of-limitations period. (SA 327-34). On February 22, 2022, the jury found Jimenez guilty of Counts One through Four of the Superseding Indictment. (SA 357-60).

### C. Jimenez's Post-Trial Motions

On March 23, 2022, Jimenez moved for a judgment of acquittal or for a new trial under Federal Rules of Evidence 29 and 33. (A. 23-49). Jimenez argued that there was insufficient evidence of money laundering (A. 38-44); that the evidence showed that Jimenez had withdrawn from the charged conspiracies prior to December 12, 2013, the start of the five-year statute-of-limitations period (A. 44-47); and that there was insufficient evidence of Jimenez's involvement in aggravated identity theft within the five-year limitations period (A. 47-49). The Government opposed Jimenez's motions. (Dkt. 430). The parties agreed that the operative date for the statute-of-limitations analysis with respect to Counts One through Three was December 12, 2013, five years before the filing of the Original Indictment. (A. 30-32; Dkt. 430 at 14; Dkt. 41).

On April 28, 2022, Judge Stein denied Jimenez's post-trial motions. (SPA 1-7). With respect to Counts One and Two, Judge Stein determined that there was sufficient evidence that Jimenez continued to engage in, and benefit from, the charged conspiracies until 2015, well into the limitations period:

> [T]here manifestly was enough evidence presented at trial for a reasonable juror to find Jimenez guilty beyond a

> reasonable doubt. Any evidence that Jimenez withdrew from the conspiracy is rebutted by evidence that he did not, and there is strong evidence that he continued to benefit from the conspiracy well into 2015. . . . In the face of this evidence, the Court is not concerned that an innocent person may have been convicted here.

(SPA 4). Judge Stein also determined that there was sufficient evidence for a reasonable jury to find Jimenez guilty of Counts Three and Four. (SPA 4-7).

### D. Jimenez's Sentencing

On September 12, 2022, Judge Stein sentenced Jimenez to 144 months' imprisonment, to be followed by three years' supervised release. (A. 108-09). Judge Stein also ordered Jimenez to forfeit $14,580,000 and his interest in three properties, pay $44,769,906 in restitution, and pay a mandatory $400 special assessment. (A. 110-11). Jimenez does not challenge any aspect of his sentence on appeal.

## ARGUMENT

## POINT I

### The Evidence Was Sufficient to Support Jimenez's Convictions

Jimenez argues that his convictions on Counts One and Two should be reversed for two reasons. First, Jimenez argues that "the evidence was insufficient"

because "it failed to show an agreement between Mr. Jimenez and the other members of the Melosky staff to defraud the IRS or commit wire fraud." (Br. 42). Second, Jimenez argues that "the evidence adduced at trial showed that Mr. Jimenez affirmatively and completely withdrew from the conspiracy prior to December 12, 2013, the cutoff date," or, in the alternative, that evidence of his withdrawal "renders the evidence insufficient" to uphold his convictions. (Br. 25-26). These arguments are meritless. There was more than sufficient evidence for a reasonable jury to find Jimenez guilty of the charged conspiracies and to reject Jimenez's withdrawal defense.

## A. Applicable Law

### 1. Sufficiency of the Evidence

"A defendant challenging the sufficiency of the evidence bears a heavy burden[.]" *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020).

When considering the sufficiency of the evidence supporting a guilty verdict, this Court "must view the evidence in the light most favorable to the government." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir.

2021). This Court must analyze the pieces of evidence "in conjunction, not in isolation," and apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *Atilla*, 966 F.3d at 128. It is not the Government's burden to "disprove every possible hypothesis of innocence." *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998). This Court must "credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *Jabar*, 19 F. 4th at 76, because "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court," *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020). This rule applies regardless of "whether the evidence being reviewed is direct or circumstantial," *United States v. Chow*, 993 F.3d 125, 135 (2d Cir. 2021); "the jury is entitled to base its decision on reasonable inferences from circumstantial evidence." *Ho*, 984 F.3d at 199. "Where there are conflicts in the testimony, [the Court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011).

With respect to a conspiracy conviction, the "high degree of deference" afforded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021). "The agreement to participate in the conspiracy may

be inferred from the facts and circumstances of the case, and both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *Id.*; *see also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 113 (2d Cir. 2008).

This Court reviews "preserved claims of insufficient evidence *de novo*," *United States v. Percoco*, 13 F.4th 158, 169 (2d Cir. 2021), and unpreserved claims of insufficient evidence for plain error, *see, e.g.*, *United States v. Clare*, 652 F. App'x 32, 34 (2d Cir. 2016); *United States v. Murray*, 414 F. App'x 318, 319-20 (2d Cir. 2011); *United States v. Draper*, 553 F.3d 174, 179 (2d Cir. 2009). This Court reviews a district court's decision to deny a motion for a new trial for abuse of discretion. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013).

### 2. Statute of Limitations and Withdrawal from a Conspiracy

The statute of limitations for the crimes charged in the Superseding Indictment is five years. *See* 18 U.S.C. § 3282(a). "Once an indictment is brought, the statute of limitations is tolled as to the charges contained in that indictment." *United States v. Milstein*, 401 F.3d 53, 67 (2d Cir. 2005). "Further, a superseding indictment that supplants a pending timely indictment relates back to the original pleading and inherits its timeliness as long as the later indictment does not materially broaden or substantially amend the

original charges." *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003).

The limitations period "normally begin[s] to run when the crime is complete." *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir. 2008). "Conspiracy is generally a continuing crime," meaning that its commission "is not complete until the purposes of the conspiracy have been accomplished or abandoned." *Id.* at 47. "[A] defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot." *Smith v. United States*, 568 U.S. 106, 111 (2013).

Once the Government "has presented sufficient evidence to show a conspiracy that has continuing purposes or goals, the burden is on the defendant to prove . . . that he took affirmative steps to withdraw." *Eppolito*, 543 F.3d at 49; *see also United States v. Hamilton*, 538 F.3d 162, 173 (2d Cir. 2008) ("[W]ithdrawal from a conspiracy is an affirmative defense which the defendant must prove by a preponderance of the evidence."). "[A]bsent withdrawal, a conspirator's participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *Salmonese*, 352 F.3d at 615; *see also United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999); *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 1997).

"Mere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal." *Leslie*, 658 F.3d at 143. Similarly, "resignation from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law." *United States v.*

*Berger*, 224 F.3d 107, 118 (2d Cir. 2000). Instead, a defendant must produce "affirmative evidence of withdrawal," demonstrating that he "performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *Leslie*, 658 F.3d at 143. Furthermore, "the defendant must not take any subsequent acts to promote the conspiracy, . . . and must not receive any additional benefits from the conspiracy." *Berger*, 224 F.3d at 118; *see also Eppolito*, 543 F.3d at 49 ("'[T]he defendant must not take any subsequent acts to promote the conspiracy' or 'receive any additional benefits from the conspiracy.'" (quoting *Berger*, 224 F.3d at 118)).

### B. Discussion

#### 1. There Was Sufficient Evidence to Support Jimenez's Convictions

The evidence was more than sufficient to prove that Jimenez committed each of the charged offenses. In challenging his convictions on Counts One and Two, Jimenez argues that there was insufficient evidence "to show an agreement between Mr. Jimenez and the other members of the Melosky staff to defraud the IRS or commit wire fraud." (Br. 42). As an initial matter, because Jimenez did not challenge the sufficiency of the evidence on this basis below, Jimenez's claim is reviewed for plain error. *See Clare*, 652 F. App'x at 34; *Murray*, 414 F. App'x at 319-20. Here, there was no error, plain or otherwise, because the evidence

overwhelmingly supported the jury's determination that Jimenez participated in the charged conspiracies.

First, Jimenez was the owner, primary decisionmaker, and one of the most popular tax preparers at the Jimenez Tax Business, where tax fraud was rampant. (SA 75, 79, 92, 95, 106-07, 172, 175-77, 182-83). Nunez testified that Jimenez directed and taught her how to add false dependents to clients' tax returns. (SA 170 ("Q: Now who, if anyone, instructed you to falsify a tax return[] in this way? A: I actually learned it from Ariel. He was the one that asked me from the beginning to actually file people's tax returns with a fake dependent."); *see also* SA 196, 257). Nunez also testified that Jimenez and Evelin Jimenez taught her how to falsify expenses on clients' tax returns, including by adding false education and employee expenses. (SA 216-17). Elvy Jimenez similarly testified that Jimenez participated in the tax fraud conspiracy and, in particular, that Jimenez and others at the Jimenez Tax Business prepared tax returns with false dependents. (SA 79, 92, 98, 107). The cooperating witnesses' testimony about Jimenez's involvement in the Tax Fraud Scheme was corroborated by documentary evidence, including sign-in sheets indicating that clients had visited the Jimenez Tax Business to meet with tax preparer "Ariel" or "Ariel Jimenez" (SA 44-46) and a list, in Jimenez's handwriting, showing how many false dependents different clients had purchased (SA 55, 214-15).

Second, Jimenez was involved in acquiring lists of stolen identities of children to be used in the Tax Fraud scheme, including by purchasing the lists from

Leonel Severino. (SA 85, 98-99, 169, 178-79, 199-201, 257-58). Nunez's and Elvy Jimenez's testimony on this point was corroborated by financial records, which showed that Jimenez signed checks payable to Severino. (SA 52-54).

Third, Jimenez and other tax preparers at the Jimenez Tax Business prepared fraudulent tax returns, which included false dependents, for the three former clients who testified at trial. (SA 56-74, 130-54, 259-64). In particular, Brigido Abreu testified that Jimenez prepared false tax returns for Abreu for the tax years 2011 and 2012, each time selling Abreu a false dependent for $1,000 or more. (SA 138-50). Abreu identified a note on which Jimenez wrote Abreu's estimated 2011 tax refund. (A. 217; SA 138-39, 155-58). The handwriting on the note matched Jimenez's handwriting in his letters to Nunez. (*Compare* A. 217, *with* SA 1-3).[6] Other tax preparers at the Jimenez Tax Business prepared Abreu's false 2013 tax return, as well as

---

[6] Jimenez suggests that Abreu was mistaken about the tax year to which the note related. (*See* Br. 7 (Abreu "admitted that the Post-it note contained numbers that exactly matched his 2013 return, not his 2011 return.")). But if anything, Jimenez's argument only undercuts his own withdrawal defense: if Abreu was mistaken and the note related to Abreu's refund for the 2013 tax year, then Jimenez must have written it in 2014, within the limitations period. Jimenez does not dispute, and the jury certainly was entitled to credit, that the handwriting on the note is Jimenez's.

the false tax returns of the other two clients, showing the conspiracy at work. (SA 56-74, 150-54, 259-64).

Fourth, Jimenez received most of the profits of the Tax Fraud Scheme. (SA 100, 107-08). In addition to drawing from the millions of dollars deposited into the Business's corporate bank accounts, Jimenez personally retained $1,000 in cash from each false dependent fee charged to clients, with the rest of the cash fees going to Jimenez's co-conspirators. (SA 104-05, 202, 205-08, 254-55). At the end of each tax season, Jimenez, his sisters, and Nunez counted and divided up the large amounts of cash generated from the false dependent fees. (SA 26, 204-07). The false dependent fees generated millions of dollars in profits for Jimenez based on the volume of false tax returns filed by the Jimenez Tax Business. For the tax years 2009 through 2014, the Jimenez Tax Business prepared more than 24,000 tax returns, of which more than 14,000, or about 58%, claimed the EITC. (SA 47-48). This was consistent with Nunez's and Elvy Jimenez's estimates that the Jimenez Tax Business added false dependents to 50%, or even as many as 70%, of its clients' tax returns. (SA 95, 172). Jimenez's receipt of the lion's share of proceeds of the Tax Fraud Scheme—which Jimenez spent on, among other things, gambling, vacations, luxury goods, and real estate (SA 4-6, 234-36)—further demonstrated his knowing participation in the conspiracy.

Against the overwhelming evidence of his guilt presented to the jury, Jimenez's sufficiency arguments amount to an effort to discredit the witnesses and evidence against him. (Br. 42-59). Jimenez presented

these arguments to the jury, and the jury necessarily, and reasonably, rejected them in reaching its verdict. (SA 308-27, 335-53). Jimenez's attacks provide no basis to disturb the jury's verdict. *See United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge, particularly when, as is the case here, trial counsel already presented these same credibility arguments to the jury."); *United States v. Delva*, 282 F. App'x 89, 90-91 (2d Cir. 2008) ("[Defendant's sufficiency] challenge must fail because it amounts only to a challenge to the credibility of the government's cooperating witnesses. . . . The proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury, not in an appellate brief.").

Finally, Jimenez argues in passing in a footnote that, if this Court accepts his insufficiency challenges to Counts One and Two, "then the Court should necessarily acquit Mr. Jimenez of the money laundering charges as well, since it was the purportedly illicit proceeds of the conspiracy that Mr. Jimenez was accused of laundering." (Br. 43 n.1). Jimenez also asserts that "Mr. Jimenez in fact invested the proceeds of the tax business in real estate, *see* GX 1025, which was not concealed and was not funded with the cash payments for false dependents." (*Id.*). As an initial matter, this Court should decline to consider this purported sufficiency challenge to Jimenez's conviction on Count Four, as Jimenez's arguments, raised in passing only in a footnote, are insufficiently developed for appellate review. *See, e.g.*, *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("It is well-established in this

Circuit that [this Court] do[es] not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."). To the extent that the Court reaches Jimenez's challenge, it should reject it. Jimenez's argument that his conviction on Count Four rises and falls with his convictions on Counts One and Two is legally incorrect, because the money laundering charge in Count Four was predicted on substantive wire fraud, in violation of 18 U.S.C. § 1343, not on the conspiracy offenses charged in Counts One and Two. (A. 17-18 ¶ 5). As the District Court determined, there was sufficient evidence at trial to support Jimenez's conviction on Count Four. (SPA 5-7).

In sum, the evidence at trial was amply sufficient to support the jury's guilty verdict.

### 2. The District Court Correctly Denied Jimenez's Post-Trial Motions Challenging His Conspiracy Convictions Based on His Withdrawal Defense

Jimenez's withdrawal defense at trial rested primarily on the testimony of Elvy Jimenez about two statements that Jimenez made in 2012 or early 2013. (SA 96-101). Around the summer of 2012, Jimenez ordered his sisters, Ana and Evelin Jimenez, to burn the lists of stolen identities. (SA 100-01). Then, later in 2012 or early 2013, Jimenez told the Business's employees "that if any client came in asking for dependents, that they were to say that that was not being done anymore." (SA 97; *see also* SA 101 (Jimenez "let all of the employees know that they were not to work

with the lists")). At trial, Jimenez argued to the jury that, based on these statements, Jimenez withdrew from the conspiracy before December 12, 2013, the start of the five-year statute-of-limitations period. (SA 304-05, 327-31). Jimenez also argued that his withdrawal defense was supported by other evidence, including that Elvy Jimenez and other employees of the Jimenez Tax Business left the Business in late 2013 to start their own tax preparation company where they engaged in similar fraud. (SA 331-34). Jimenez repeated these arguments—which were considered and necessarily rejected by the jury—in his post-trial motions and does so again on appeal. (Br. 25-41).

As the District Court correctly found in denying Jimenez's post-trial motions, the evidence was more than sufficient to allow a reasonable jury to reject Jimenez's defense that he withdrew from the charged conspiracies before December 12, 2013. (SPA 3-4). Critically, Elvy Jimenez testified that "[n]othing changed" at the Jimenez Tax Business after Jimenez's purported instructions to the staff in 2012 or early 2013 (SA 101): the Business "continue[d] selling dependents to customers" (SA 97), Elvy Jimenez continued adding false dependents to client tax returns, including tax returns prepared by Jimenez (SA 97-98), and Leonel Severino continued bringing lists of stolen identities to the Jimenez Tax Business (SA 99). Elvy Jimenez's testimony—that, after Jimenez's purported instructions to his staff, the Tax Fraud Scheme, and Jimenez's participation in it, continued as before—permitted a reasonable jury to reject any defense arguments that Jimenez "disavowed his criminal association with the conspiracy." *Leslie*, 658 F.3d at 143.

A reasonable jury similarly would have rejected Jimenez's arguments that spin-off businesses started by some of his co-conspirators somehow supported his withdrawal defense. That, to make more money, Elvy Jimenez and some other employees left the Jimenez Tax Business in October 2013 to start their own tax preparation company where they engaged in similar fraud (SA 79, 100, 179-80) was irrelevant to any of the issues before the jury. This fact had no bearing on Jimenez's and others' continued participation in the Tax Fraud Scheme at the Jimenez Tax Business.

The jury's rejection of Jimenez's withdrawal defense was also supported by evidence that contextualized Jimenez's purported instructions to his staff in 2012 or early 2013. In 2012, Nunez and others at the Jimenez Tax Business, including Jimenez himself, received letters from the state tax authorities imposing substantial fines for the Jimenez Tax Business's repeated misuse of personal property rental expenses on clients' tax returns. (SA 216-20; GX 831). Around the same time, the Jimenez Tax Business was receiving numerous complaints from clients regarding the Business's sale of false dependents. (SA 240-41). The increased scrutiny led Jimenez to transfer the Henry Hudson Property to his father in January 2013 to "protect" it. (SA 41, 240; GX 1204 at 7). This evidence—coupled with Elvy Jimenez's testimony and other evidence that "[n]othing changed" after Jimenez's purported instructions to his staff (SA 101)—permitted the jury to reasonably infer that, "far from actually withdrawing from the conspiracy, [Jimenez] was simply attempting to obfuscate his role in the conspiracy." (SPA 4). Notably, prior to 2012, Jimenez directed

his staff to digitize some of the stolen identity information used in the Tax Fraud Scheme (SA 209-13)—a fact that further supported the reasonable inference that Jimenez's instruction to "burn" physical lists of stolen identities was an effort to conceal the Tax Fraud Scheme and Jimenez's role in it, rather than to "ensur[e] that the primary tool used to achieve the purpose of the charged conspiracy was no longer present." (Br. 34).[7]

Other evidence corroborated that "[n]othing changed" after Jimenez's purported instructions to his staff in 2012 or early 2013 (SA 101), and that Jimenez continued to take "acts to promote the conspiracy," *Berger*, 224 F.3d at 118. In March 2013, around or after the time of Jimenez's purported withdrawal, Jimenez prepared and filed Abreu's 2012 tax return, which included a false dependent that Jimenez sold to Abreu for over $1,000. (A. 175-94; SA 146-50). In 2014, other tax preparers at the Jimenez Tax Business prepared and filed fraudulent 2013 tax returns, with false

---

[7] Notably, Elvy Jimenez testified that Jimenez told him in 2009, when Elvy Jimenez was just starting at the Jimenez Tax Business, that, if any client came in asking for a dependent, Elvy Jimenez was to respond, "I don't do that and the office does not do that." (SA 96). This early remark, after which Jimenez, Elvy Jimenez, and others readily continued participating in the Tax Fraud Scheme for years, further supported the reasonable inference that Jimenez's purported instructions to his staff in 2012 or early 2013 were merely an effort to conceal the Tax Fraud Scheme.

dependents, for Abreu and Alex Lopez, another client who testified at trial. (A. 195-216; SA 72-74, 150-54; GX 292). The Jimenez Tax Business continued to prepare and file a large number of tax returns in 2014 and 2015. In those two years, the Jimenez Tax Business prepared and filed approximately 5,257 tax returns for clients for the tax years 2013 and 2014, of which approximately 3,104, or about 59%, claimed the EITC—a figure that, like in the earlier years, was significantly disproportionate to the percentage of taxpayers nationwide and in the Bronx who claimed the EITC during the same period. (SA 47-48; *see also* GX 307). The Jimenez Tax Business continued operating even after the law enforcement search in early 2015, after which Jimenez directed that the business operate under the name "Graph" from a nearby location. (SA 226-30). Jimenez continued to file tax returns for the Jimenez Tax Business from the Dominican Republic in 2015. (SA 231-33).

Financial records showed that Jimenez also continued to receive "additional benefits from the conspiracy," *Berger*, 224 F.3d at 118, within the limitations period. In January 2014, Jimenez opened several new corporate bank accounts for the Jimenez Tax Business, then operating under the name JIMFA (the "JIMFA Accounts"). (GX 1351, 1352, 1356, 1357, 1358). Jimenez was a signatory on the JIMFA Accounts, bearing the title "President" or "Managing Member." (*Id.*). In 2014, one of the JIMFA Accounts received more than $850,000 in deposits, mostly consisting of tax preparation fees generated by the Jimenez Tax Business. (SA 285-87; GX 1025 at 6). Jimenez used these proceeds for his benefit, including by personally

withdrawing approximately $451,000 in April 2014 to pay for the University Avenue Property. (SA 290-91; GX 1035, 1036).

Taken together, this evidence showed that Jimenez did not "disavow[] his criminal association with the conspiracy," *Leslie*, 658 F.3d at 143, and that he continued both to take "acts to promote the conspiracy" and to receive "additional benefits from the conspiracy," *Berger*, 224 F.3d at 118, well into the limitations period. As the District Court correctly found, the evidence was more than sufficient to support the jury's determination that Jimenez did not withdraw from the charged conspiracies and that Jimenez was guilty as charged. (SPA 4).[8]

---

[8] The Government understands Jimenez to be challenging only the denial of his Rule 29 motion. (*See* Br. 25 ("The District Court erred in denying Mr. Jimenez's Rule 29 Motion for Acquittal because the evidence adduced at trial showed that Mr. Jimenez affirmatively and completely withdrew from the conspiracy prior to December 12, 2013, the cutoff date.")). To the extent that Jimenez is also challenging the denial of his Rule 33 motion, any such challenge should be rejected for the same reasons. Based on the overwhelming evidence of Jimenez's guilt and the ample evidence to support the jury's rejection of Jimenez's withdrawal defense, the District Court did not abuse its discretion in determining that "the interests of justice d[id] not require a new trial" and that "the [District] Court ha[d] no real concern that an innocent person has been convicted." (SPA 7). *See James*, 712 F.3d

Case 22-2090, Document 41, 04/05/2023, 3495069, Page35 of 43



## POINT II

### The District Court Did Not Err in Its Jury Instructions on Withdrawal

Jimenez argues that the District Court's jury instructions on withdrawal from a conspiracy contained reversible error. (Br. 15-25). This argument is meritless. The District Court's jury instructions on withdrawal were correct, and any purported error was harmless in any event.

### A. Relevant Facts

In advance of the charge conference, Jimenez requested that the District Court instruct the jury on the defense of withdrawal from a conspiracy. (Dkt. 394). At the charge conference, the Government requested an instruction that, to effectively withdraw from a conspiracy, "the defendant must not take any subsequent acts to promote the conspiracy or receive any additional benefits from the conspiracy" (SA 294 (citing *Eppolito*, 543 F.3d at 49)). Jimenez objected to this instruction and argued that the "or" in the instruction should be replaced with "and." (SA 294-99). The District Court initially agreed with Jimenez's argument (SA 299-300), but later explained that replacing "or" with "and" resulted in a formulation that was not grammatically correct. (SA 354 ("'He must not take any subsequent steps to promote the conspiracy and

---

at 107 ("For a trial judge to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted.").

receive additional benefits.' The English there doesn't work.")). Accordingly, the District Court revised the instruction to quote the language from *Berger*: "He must not take any subsequent steps to promote the conspiracy and must not receive additional benefits from the conspiracy" (SA 354). *See Berger*, 224 F.3d at 118 ("[T]he defendant must not take any subsequent acts to promote the conspiracy . . . , and must not receive any additional benefits from the conspiracy[.]"). In response to Jimenez's objection to this phrasing, the District Court reformulated the instruction in an equivalent way: "He must not take any subsequent steps to promote the conspiracy nor receive additional benefits from the conspiracy." (SA 355). Jimenez preserved his previous objection but otherwise assented to the District Court's reformulation. (SA 355).

After the charge conference, Jimenez filed a letter objecting to both versions of the District Court's proposed instruction, which Jimenez articulated as: "He must not take any subsequent steps to promote the conspiracy *nor [or 'and must not']* receive additional benefits from the conspiracy." (A. 117 (emphasis added)). Jimenez argued that the "[t]he *Berger* case makes clear that, despite actions to withdraw from the conspiracy, a defendant will be deemed to remain a part of the conspiracy if he/she continues to do acts in furtherance of the conspiracy AND continues to receive benefits from the conspiracy's operations." (A. 118-19 (citation and internal quotation marks omitted)). Jimenez requested the following instruction: "However, even if the defendant completely severs his ties with the conspiracy, the defendant still may remain a part of the conspiracy if he or she

continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations." (A. 119).

The District Court did not give Jimenez's proposed instruction and instead instructed the jury as it had proposed: "[The defendant] must not take any subsequent steps to promote the conspiracy, nor receive additional benefits from the conspiracy in order to effectively withdraw from the conspiracy." (SA 356). The District Court also issued other standard instructions relevant to withdrawal that Jimenez does not challenge on appeal.

## B. Applicable Law

A defendant challenging a jury instruction faces a "heavy burden." *United States v. Feliciano*, 223 F.3d 102, 116 (2d Cir. 2000). He must demonstrate that: (1) he requested a charge that "accurately represented the law in every respect"; and (2) "viewing as a whole the charge actually given, [the defendant] was prejudiced." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). In reviewing jury instructions, this Court "examine[s] not only the specific language that the defendant challenges but also the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Al Kassar*, 660 F.3d 108, 127 (2d Cir. 2011). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Wilkerson*, 361 F.3d at 732.

This Court will review preserved objections to jury instructions "*de novo* but will reverse only if all of the

Case 22-2090, Document 41, 04/05/2023, 3495069, Page38 of 43



instructions, taken as a whole, caused a defendant prejudice." *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011). Reversal is not warranted if the error was harmless. *See* Fed. R. Crim. P. 52(a); *United States v. DeMizio*, 741 F.3d 373, 384 (2d Cir. 2014). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

### C. Discussion

The District Court's jury instruction—that "[the defendant] must not take any subsequent steps to promote the conspiracy, nor receive additional benefits from the conspiracy in order to effectively withdraw from the conspiracy" (SA 356)—is a correct statement of the law. This Court has made clear that, to effectuate withdrawal from a conspiracy, "'the defendant must not take any subsequent acts to promote the conspiracy' or 'receive any additional benefits from the conspiracy.'" *Eppolito*, 543 F.3d at 49 (quoting *Berger*, 224 F.3d at 118). In other words, a defendant who either takes subsequent steps to promote the conspiracy or receives additional benefits from the conspiracy has not effectively withdrawn from the conspiracy. *See, e.g.*, *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir. 1992) (no withdrawal where defendant resigned from a corrupt law firm but continued to receive additional benefits from the conspiracy). This well-established principle comports with common sense: a defendant who either continues to promote the conspiracy or continues to reap its benefits has not effectuated a

"complete and permanent" disassociation from the conspiracy. *United States v. Martinez*, 862 F.3d 223, 233 (2d Cir. 2017), *cert. granted, judgment vacated sub nom. on other grounds*, *Rodriguez v. United States*, 139 S. Ct. 2772 (2019). The District Court's instruction accurately conveyed the law.

After objecting below to the District Court's offer to give an instruction that quoted directly from *Berger* (A. 117; SA 354-55), Jimenez now contends that "[t]he District Court failed to apply *Berger*." (Br. 18). Specifically, Jimenez argues that, "[u]nder *Berger*, the formulation of this test is written in the conjunctive, requiring proof of both facts. In other words, getting 'any additional benefit' from the conspiracy alone—without accompanying acts to promote the conspiracy—would be insufficient to defeat the defendant's showing of withdrawal." (Br. 17). Jimenez misconstrues *Berger*. In *Berger*, this Court held that, to effectuate withdrawal, "the defendant *must not* take any subsequent acts to promote the conspiracy . . . , *and must not* receive any additional benefits from the conspiracy." 224 F.3d at 118 (emphasis added). The plain meaning of this holding is that the defendant must *neither* take any subsequent steps to promote the conspiracy *nor* receive any additional benefits from the conspiracy; a showing of either is sufficient to defeat withdrawal. Indeed, *Berger* cites *Eisen*, in which this Court affirmed a finding of no withdrawal based on a showing of continued receipt of corrupt benefits alone. *See Eisen*, 974 F.2d at 269; *Berger*, 224 F.3d at 118-19 (citing *Eisen* for the proposition that the defendant "must not receive any additional benefits from the conspiracy"). And in *Berger* itself, this Court held that there was

"adequate evidence to support the jury's apparent rejection of [the defendant's] withdrawal defense" based on a showing of continued efforts to promote the conspiracy, with no discussion of any continued receipt of benefits. *See* 224 F.3d at 119. *Berger* therefore makes clear that, contrary to Jimenez's argument, "either fact—subsequent acts to promote *or* receiving any additional benefit from the conspiracy—standing alone could defeat [a] withdrawal defense." (Br. 17 (emphasis in original)). This Court correctly interpreted *Berger* in precisely this way in *Eppolito*. *See Eppolito*, 543 F.3d at 49 ("'[T]he defendant must not take any subsequent acts to promote the conspiracy' or 'receive any additional benefits from the conspiracy.'" (quoting *Berger*, 224 F.3d at 118)).[9] The District Court's instruction—that "[the defendant] must not take any subsequent steps to promote the conspiracy, nor receive additional benefits from the conspiracy in order to effectively withdraw from the conspiracy" (SA 356)—

[9] As Jimenez notes (Br. 16), *Berger* cites a Third Circuit decision that stated that "the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations." *Berger*, 224 F.3d at 119 (quoting *United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995)). As the District Court observed (SA 354), this formulation is grammatically unclear. The key point, however, is that this Court articulated the requirements unambiguously in *Berger* itself, and subsequently reaffirmed them in *Eppolito*.

Case 22-2090, Document 41, 04/05/2023, 3495069, Page41 of 43



clearly and accurately conveyed the law as articulated in both *Berger* and *Eppolito*.

Finally, even if Jimenez could show error in the District Court's instructions, any such error was harmless. *See* Fed. R. Crim. P. 52(a); *DeMizio*, 741 F.3d at 384. As described above, *see* Point I.B.2 *supra*, the Government presented overwhelming evidence that Jimenez never "disavowed his criminal association with the conspiracy" in the first place, as required for withdrawal, *Leslie*, 658 F.3d at 143, and further showed that Jimenez both took "subsequent steps to promote the conspiracy" and "receive[d] additional benefits from the conspiracy," *Berger*, 224 F.3d at 118, well into the limitations period. On this record, this Court can be satisfied that the purported "error complained of did not contribute to the verdict obtained." *Neder*, 527 U.S. at 15.

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated: New York, New York
April 5, 2023

Respectfully submitted,

DAMIAN WILLIAMS,
*United States Attorney for the Southern District of New York, Attorney for the United States of America.*

DANIEL G. NESSIM,
NI QIAN,
OLGA I. ZVEROVICH,
*Assistant United States Attorneys, Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 8,375 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the Southern District of New York*

By: OLGA I. ZVEROVICH,
*Assistant United States Attorney*